CASE NO. 8:15CV107

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

TABITHA MANNING,

Plaintiff,

-vs.-

VAUGH COTTON, an Omaha Police Officer;
THEODORE DELEZENE, an Omaha Police Officer;
and CITY OF OMAHA NEBRASKA

Defendants.

DEFENDANTS' TRIAL BRIEF

Prepared and submitted by:
THOMAS O. MUMGAARD, No. 16004
Special Projects Attorney
WILLIAM ACOSTA-TREJO, No. 23302
Assistant City Attorney
804 Omaha/Douglas Civic Center
1819 Farnam Street
Omaha, NE  68183
(402) 444-5115

## SUMMARY OF THE CASE PROGRESSION
## AND THE TRIAL THEORIES

This case comes to trial after denial of a motion to dismiss, denial of a motion for summary judgment, denial of a motion in limine, denial of a motion to bifurcate, and an unsuccessful interlocutory appeal from the summary judgment decision.  The court has seen many descriptions of the expected evidence.  However, it will be reviewed again here to draw attention to the theories supporting why that evidence is presented and how the court should rule upon expected trial motions.

Plaintiff ("Manning") brings this civil rights lawsuit alleging two Omaha police officers ("Cotton" and "Delezene") planted drugs on a woman in their cruiser, arrested her, and furthered a false prosecution by falsely testifying about the drug discovery.  The employer, City of Omaha ("the City") is also a defendant, facing allegations it proximately caused these officers' conduct by failing to follow a particular hypothetical method of investigation when similar allegations were made against other officers several years earlier.

On their interlocutory appeal, the defendants argued the district court didn't properly use an individualized analysis of the two officers in examining the summary judgment evidence.  The appeals court agreed.  *Manning v. Cotton, et al.,* 862 F.3d 663, at 668.  That individualized analysis will also be required of the jury here and a description of it can be found in the appeal opinion.  At the end of trial, instructions must tell the jury to evaluate the claims against these officers individually.  For that reason, this brief will treat the expected evidence individually for each individual defendant.

Initially, the Complaint alleged two other claims.  The motions and appeal have narrowed the claims, as expressed in the statement of issues in the pretrial order.  Plaintiff's allegation that the initial traffic stop was improper has been dismissed – there is no longer any controversy

about the lawfulness of these officers coming into contact with Manning.  Also, Plaintiff's claim that the officers conspired together has been dismissed for a lack of evidence.

The policy claims against the City will rest on one isolated and unique previous situation where officers with no relation to this arrest were alleged by a fellow officer to be planning to plant drugs on a suspect.  Manning will assert that the Police Department in that instance essentially "gave the officers a break" by immediately choosing to investigate the report rather than waiting and trying to catch the corrupt officers in the act.  Manning, however, has no expert or other evidence to support this description of the investigation.  In addition, Cotton and Delezene will testify they had limited knowledge about that previous situation and had no real knowledge of any choices the Department made about how to conduct its investigation.  There will be no evidence of any causal link.  In addition, the City will present evidence showing its stated policies and previous conduct really would have sent the message to any officer that planting evidence on a suspect will never be accepted by their employer.

In addition to asking the jury to focus on the officer's individual conduct, their evidence presented at trial will look principally at three questions: (1) who had the opportunity; (2) who had the motivation; and (3) who has the burden of proof?  The officers will tell the jury Manning had the opportunity and motivation to leave the drugs in the car and carries the burden of proof of showing otherwise.  They'll tell the jury neither officer had the opportunity or motivation to frame this woman who'd been stopped for a traffic violation and that they do not have to prove Manning left the drugs in the cruiser.

What this case is not about:  Cotton and Delezene will tell the jury this case is not about whether Manning did or did not drop the drugs as she squirmed in the cruiser's back seat.  She will continue to deny the drugs came from her, but her guilt is not an issue for the jury.

Unavoidably, it's what a juror may want to focus on and it will remain a peripheral issue to Manning's allegations, so the defendants will present evidence that Manning could have put the drugs there.  That's part of their showing of opportunity.  But, the most significant issue for the jury to decide is whether Manning has presented evidence that makes it more likely than not that one of these police officers put the drugs there instead of Manning or some other explanation.  At the end of presenting evidence, the defendants will tell the court that Manning has failed to carry that burden.

**THE CRUISER VIDEO and**
**MANNING'S INVESTIGATIVE DEMANDS**

Two things that seemed to be significant in the district court's review of the motion for summary judgment on qualified immunity should be mentioned.  In its decision rejecting the officers' motion, the district court focused its attention on the cruiser video that will be shown to the jury.  Because much of the pertinent conduct is captured on video, either outside the cruiser or inside the cruiser's back seat, there is not much controversy about what happened up to when Delezene discovered the drugs in the cruiser.  But a word of caution about the video should be kept in mind.

The district court's analysis of the cruiser video when reviewing the motion for summary judgment led the court to conclude "it does not appear that plaintiff reaches into her pocket or anywhere else to pull out and drop the methamphetamine."  (Summary Judgment Order, p. 7). The officers will agree the video reveals no overt reaching into Manning's pocket or elsewhere. So what?  The jury will be told that conclusion is too simplistic and ignores other evidence.  The jury will be told it should reach a different conclusion than did the district court when the video is reviewed.

- 3 -

The jury will be told any objective viewer must conclude the video is indefinite. The video supports neither conclusion about the drugs' origin. Cotton will testify that he found the video indefinite when he first viewed the video at Manning's urging. We certainly can see movement of Manning's body as she rode and she will admit she moved forward in the seat in a manner that would have kept her hands free within the confines of the handcuffs. Because Manning's hands are behind her back, nobody, including these officers, the court, or the trial jury, can't see what she's doing with her hands. If she was able to hold the drugs in her hand instead of in a pocket, only slight movement would be necessary toss the small bag toward the door. If the drugs were tucked into her waistband, only slight movement would be necessary to retrieve the small bag and toss it. If the drugs were in her right pocket, the pocket next to the door and which was not searched, only slight movement would be necessary to pull out the drugs and flick them toward the door to fall down to where they were found.

But the important point is not whether the video shows Manning did or didn't retrieve drugs from some hiding place. That became the sole importance the district court gave the video during the summary judgment review. The defendants will tell the jury not to do that. The evidence will establish that the video does not show everything that is significant. The evidence will show the video stopped after the cruiser arrived at the Corrections Center garage and before the drugs were found. Why it stopped is not important – the important thing is that is stopped for a significant time period. The testimony and supporting evidence will show that during this time the officers left Manning unattended in the back seat as they went to the cruiser trunk to secure their weapons and retrieve Manning's purse. The evidence will show Manning then had ample time to twist her hands to the drug's hiding place and flick the drugs to fall down alongside the door.

- 4 -

Additionally, in denying summary judgment, the district court found a factual issue from Manning's testimony that the officers refused her demand to be drug tested or to test the bag for fingerprints or DNA.   The district court apparently accepted Manning's description of her demands and concluded the officers' response would be sufficient evidence for a reasonable juror to infer the officers' guilty knowledge and conclude that both of these officers are dirty cops who planted evidence and tried to railroad an innocent woman.   Again, the jury will be told don't be so led astray.

The evidence will show the officers' refusal to test as Manning was demanding is just evidence they didn't believe her denials.   The evidence will show because of the circumstances in which the drugs were found, the proper police procedure was to simply wait on the tests to be done by an investigator under conditions where the tests could be used to convict Manning. Further, the evidence will show giving Manning a personal drug test, as she demanded, would have meant nothing to the officers and the refusal to do that should mean nothing to a reasonable jury because nobody accused her of using the drugs.   The accusation made at the time was only that Manning possessed the drugs.   That possession could well have occurred without Manning ever using the methamphetamine.   Or, it could have been sufficiently long after Manning's use so a drug test wouldn't have shown anything.   The officers' rejection of a personal drug test is simply evidence the officers knew what behavior they were focusing on.   The jury will be told it is in no way evidence that they were afraid the tests would show they planted the drugs or, even, that Manning had not left the drugs there.   How would analyzing Manning's blood, breath, or other bodily fluid say anything about how the drugs got into that police cruiser?   It would not.

Manning will present no evidence to dispute the officers' testimony about why they rejected her demands, leaving that testimony unopposed.   Instead, we will have only Manning's

self-serving assertion that the testing was available and speculation that the officers knew the tests would exonerate her.

In addition, Manning's claim necessarily rests upon the officers engaging in collusive, joint, behavior when they refused the testing.  But that directly contradicts the district court's conclusion to dismiss the conspiracy claims.  The summary judgment order correctly noted the conspiracy claim required a showing that the officers "conspired."  (p. 8).  This joint agreement or action was what the district court found missing.  The district court said: "Plaintiff has no evidence, other than the package" of drugs to establish this necessary conspiracy.  The officers agree. The district court described the claim that the two officers "conspired to plant methamphetamine in the cruiser" as "pure speculation."  (p. 9).  The officers agree and will tell the jury as much.  And, if there's just speculation about any joint agreement between the officers, then there's only, at best, speculation about the meaning of the test denials. The "pure speculation" characterization applies equally to a proper jury analysis of the remaining claim. "Self-serving" denial and speculation about the source of the drugs is not sufficient evidence for a jury to find either officer put the drugs in the cruiser.


## AN INDIVIDUAL REVIEW OF THE EVIDENCE OF EACH OFFICER'S CONDUCT.

It's helpful to review the expected evidence and testimony by focusing separately on each officer defendant.  Many of the relevant facts were stipulated in the pretrial order.  They will be restated here to point out some disputes likely to arise at trial.

On September 17, 2013, Manning was driving to pick up her children from a house.  The officers were on routine patrol.  They saw a van being operated on the street with a defective tail-light.  The tail-light had broken and Manning tried to cover it with tape, but the officers will say

- 6 -

the tape allowed a white light to show through, in violation of state law. The officers turned on their overhead flashing lights and pulled in behind Manning.  At this point the video began recording.  Manning will concede that her taillight was broken and can only say that to the "best of her recollection" no white light was showing.  But, the Appeals Court's decision has made this denial irrelevant.  Why she was pulled over is not an issue at trial.

The officers got out of their cruiser, approached Manning, and engaged in a polite, courteous conversation.  They told her the reason for the stop.  Manning's told them that she did not have a drivers' license, had no car registration, and there were warrants out for her arrest. Once the officers found that a warrant had been issued for Manning's arrest, they explained to her that they had to take her into custody and transport her to the Douglas County Corrections facility.  She was put in handcuffs to be transported, as that was required by procedures. Manning denies this was police procedure, but can produce no evidence supporting that denial. Officer Delezene placed Manning in the police cruiser on the rear passenger side.

The officers did not pat down Manning or search her before placing her in the police cruiser.  Prior to getting in, Manning was allowed to make a phone call using her cellphone.  The officers were lenient with her because she was being pleasant and cooperative.  They had no concerns that she had a weapon or drugs on her person and acted throughout the encounter to assist her in getting her warrants settled.

When she entered the cruiser Manning did not see anything lying near the seat or in the area where the bag that later turned out to contain methamphetamine was found.  Manning did not see either officer put anything in the cruiser when she got into the cruiser.  After Manning was put in the cruiser, she was the only person in the back seat of the cruiser.  During the ride

from the traffic stop to the Douglas County Correctional Center (DCC), the officers were nothing less than cordial with Manning.

The cruiser was equipped with a video recording system that activated when the cruiser overhead lights were turned on and recorded from one minute before then. When it is recording outside the cruiser, the video accurately shows movement to the left and right. While outside the cruiser, Manning and the officers can be seen moving toward the passenger side of the cruiser. But, when the camera records Manning in the rear seat, it's a mirror image and she appears to be sitting on the driver's side. The jury will be reminded Manning sat on the passenger side and entered and exited the passenger door. When the cruiser pulled into the jail garage, the video stopped when Delezene turned off the car.

After arriving at the jail garage, both officers put their weapons in the trunk and were unable to watch Manning and she was not now being recorded. Manning will dispute this, but the evidence supporting the officers will be conclusive.

Officer Cotton then slid in from the driver's side to unlock the seat belt while Officer Delezene opened the rear passenger door to get Manning out. Manning concedes she did not see Cotton toss anything across the back seat as she got out of the cruiser, but that's her entire speculation on how Cotton could have planted the drugs on the far side of the hard plastic seat. In reviewing the evidence, the Appeals Court showed great distrust of this speculation, saying: "if Officer Cotton entered through the driver's side, he would have had to toss the package over or behind Manning. She would have nearly certainly seen this." And, "it seems unlikely that Officer Cotton could have planted the drugs on the seat of the passenger side door from the driver's side of the backseat". 862 F.3d 663 at 669. Nevertheless, the Appeals Court did not

- 8 -

grant him summary judgment and whether Cotton made this magical toss across the back seat remains a factual issue.

After exiting the car, Manning stood about a foot away from the cruiser's door with Officer Delezene next to her. Officer Delezene then bent over and picked up a small bag found just inside the door at the bottom of the hard plastic seat. Manning recognized the bag to be a bag of drugs and immediately denied that it belonged to her before either officer made that allegation. Manning did not see either of the officers place the bag or anything else in the cruiser.

Delezene will testify that as he opened the door to get Manning out of the cruiser, he saw a little plastic baggie with what appeared to be methamphetamine sitting on the door ledge next to the plastic rear seat. The bag was right inside the door sitting on the plastic molding in an area accessible to someone sitting inside. Delezene saw it immediately after he opened the door and looked down. Manning will say she does not know when Delezene first saw the bag of drugs, even though she was standing right next to him.

As the officers took Manning into the Corrections building, Cotton volunteered to go look at the cruiser camera video. Officer Delezene and Manning continued into the building. The officers will say they determined the video was inconclusive. The officers saw on the video that when they placed Manning in the cruiser their flashlight lit up the area where the bag was found and the area was visible. But no bag was seen at that time. Delezene asked Manning to tell the truth and she continued to deny knowledge about the bag. Manning was then arrested and charged with possession of the methamphetamine. She was booked into the Corrections Center where she remained until being released by the court three days later.

- 9 -

While being questioned by the officers, Manning claimed they had "planted the meth." They reacted as if they thought that was a silly idea. Manning agreed her assertion sounded as "stupid" as their contention that she'd put it there. During her time in the Corrections Center, Manning made a phone call to her children's aunt. During this conversation, Manning began to speculate about the bag and guessed that the bag was left in the car prior to her being placed in the backseat. She speculated one of the officers had made a mistake when they said they'd searched the car before she was in it and hadn't found anything then. Manning will concede she never heard either officer say anything suggesting a plan to put the meth in the cruiser.

The testimony will show that, at the commencement of their shift that day, Officer Cotton followed Department procedure and inspected the rear seat of the cruiser. He did not see anything in the location where the bag of drugs was later found. The officers were required by Department rules to keep a log of their activity known as a "Daily report." Delezene kept such a log that shift. It showed that no other person had been arrested and placed in the cruiser prior to Manning's ride. The officers could not remember anyone being in that seat before Manning. Prior to their encounter with Manning, the officers had found methamphetamine on no person that night or the previous week. There will be no evidence that, prior to meeting Manning, either officer possessed any meth.

At the time of Manning's arrest, Delezene and Cotton had been Omaha police officers for almost 5 years. The Omaha Police Department had trained the officers on the need for probable cause to exist before making an arrest. The officers were aware that any charges from an arrest without probable cause were subject to dismissal and an officer ignoring the need for probable cause could be subjected to discipline, including immediate termination of employment. The

evidence will show this knowledge of the Department's rules and the risk of termination gave the officers no reason or motivation to plant the bag of meth on Manning.  It would be risky.

The officers were only generally aware of previous allegations of an Omaha officer planting evidence, but were aware those allegations had been investigated by the Department. They knew that the Department expected any officer with knowledge of such misconduct to immediately report it to a supervisor so the Department could investigate.

Necessarily, if an officer plants evidence on a suspect, then arrests the suspect, that officer does not have probable cause to make that arrest.  Cotton and Delezene will say they concluded they had probable cause to arrest Manning because the bag that was easily seen when Manning was taken out of the cruiser, wasn't there during the pre-shift inspection of the cruiser, wasn't there when they put Manning in the cruiser, and they didn't put the bag there.  In their experience, people being taken to the jail often try to dump something that's held in their pockets or pants.  They reasonably believed Manning had an opportunity to attempt to dispose of the drugs by leaving them in the cruiser.

OFFICER COTTON'S CONDUCT

Cotton made a decision to follow Manning only because he'd seen a white light coming from her taillight, a violation of law.  He had no other reason to follow her and encountered her solely because of a routine traffic stop.  Given Cotton's immediate statements to Manning when he approached her van, it is clear that these officers had not targeted Manning for any type of a drug arrest – she was just a driver with a broken taillight.

After stopping in the driveway of the home where Manning was to pick up her children, Cotton immediately identified himself and explained the reason for the stop.  She gave him identifying information and volunteered that she had a warrant for her arrest.  By this time,

Officer Delezene has walked up to the passenger side of Manning's van, but Cotton is the only officer talking to Manning. Manning started to make a phone call and Cotton politely asked the reason and, learning she just wanted to contact her child care, courteously asked her assistance in keeping the children away. After learning that Manning may have a warrant for her arrest, Cotton asked her to step out of her car and sit on the police cruiser's bumper. He's not touched her or acted in any way aggressive toward her. He politely explained the significance of the existence of a warrant and that state law required him to take her into custody. When Manning protested, Cotton, again politely and professionally explained he has no choice. Still, the video shows no evidence that this woman was being targeted by the officers to be framed and give them an arrest to brag about.

The jury will be asked to question when it was that these polite officers must have, under Manning's contentions, decided to pick on her and frame her for a crime. The video certainly doesn't show anything that would allow a reasonable jury to decide that is what's happening.

Cotton then left Manning leaning against the cruiser and returned to the cruiser to make radio calls and get information. Upon returning to speak with her, he told her she actually had two arrest warrants and had to go with them. Cotton addressed her as "Tabatha" in a kind tone. When Manning shows obvious distress, both officers show only understanding. Cotton even allowed Manning to walk back to her car and retrieve her phone. After asking if there's anything else she needs from the car, Cotton retrieved Manning's purse and brought it to her. He engaged in a short discussion with a bystander (apparently the lady caring for Manning's children) and agreed to move Manning's car out of the way and does so.

During that movement of the car, Cotton did not take the opportunity to look through the car or search it, as would be likely if he was intent on making a drug arrest and didn't care about

- 12 -

probable cause for the search – he might get lucky and find something.  If he was planning to make this traffic stop into a drug arrest, finding drugs in her car would allow him to arrest her.  And, if he was carrying meth to plant on someone, he could then save the drugs for another time, maybe someone who really needed to be put in jail.  But he didn't even look to see what he might find.  And the jury will be told if Cotton is holding the meth and is intent on framing Manning, he now has two great opportunities to plant the drugs in her purse or in her car.  We see later that while he's behind the cruiser, out of Manning's sight, Cotton has another wonderful opportunity to plant the drugs in the purse as he looks through it.  Clearly he did not plant any drugs in these ideal spots.  Apparently he either didn't hold the drugs or didn't care to frame her.

Manning then placed the phone in her left pocket, the pocket that ends up away from the door where the drugs were found.  We see Cotton move briefly out of camera view on the passenger side of the cruiser then return around the front to the driver's side.

Remember, as we watch that portion of the video showing the cruiser back seat and behind, this view is taken through a mirror so the sides are switched: left is right and right is left.  Manning is placed in the cruiser on the passenger side although in the video it appears to be the driver's side.  Looking through the back window, we see Delezene handcuffing Manning as Cotton comes from the driver's side.  Delezene then moved Manning to the rear passenger door and helped her into the back seat, a hard plastic, one-piece seat.  Photos of the seat will be provided to the jury.  Cotton can be seen through the back window looking through Manning's purse then returning to the driver's seat.  At no time does Cotton get near the rear passenger seat where the drugs are later found.

Neither officer ever searched Manning.  Cotton will explain that it wouldn't be proper without a female officer present.  It's a misunderstanding of the evidence to say, as the summary

judgment order does, that because Delezene took the phone out of her <u>left</u> pocket a jury could find the drugs weren't in any of her back pockets. If the drugs were in her <u>right</u> pocket they'd be next to the door and accessible to hands held behind her back regardless of whether the phone was ever taken out of the other pocket. The jury will be told to pay attention to this detail and not be confused by Delezene's retrieval of the phone.

After they returned to the front seat, we no longer see either officer on the video. Throughout the drive we hear snitches of conversation as Manning asks questions and Cotton and Delezene courteously answer. There's no verbal indication these officers have now targeted this unfortunate women to be their prized drug arrest. Any plan that may have been hatched must have been non-verbal. More likely, no plan was ever hatched.

Cotton will testify that when he arrived at the Correctional Center he went to the trunk and put his gun away. Manning says the officers didn't do that. Cotton's recollection is more credible when we look at the cruiser video. As the cruiser pulls into the jail's garage, on the wall ahead, in large, commanding letters, is the command: "SECURE ALL WEAPONS." A photo of this command will be presented to the jury. Cotton's testimony is credible as he is just about to enter a locked jail facility and not taking a weapon in is rational conduct; following the painted command is what he would do. In addition, before they leave the arrest scene, the video shows Cotton placing Manning's purse in the cruiser trunk. Documents in evidence will show upon arrival at the jail, the purse was retrieved from the trunk and testimony will show that occurred at the same time the officers put their weapons in the trunk.

This time period and disputed testimony is significant. Manning is now out of both officers' sight and the video is off. She's free during this time to move as aggressively as needed to remove the drugs from their hiding place on her body (e.g., her right back pocket that did not

hold the phone or tucked in her waistband that's covered by her shirt). The credible evidence will show there was a time when Manning was in the cruiser unobserved and able to drop the drugs into the space where the bag was then found. She had opportunity.

Cotton first became aware of the drugs when Delezene held up the small bag of drugs he found on the ledge between the hard seat and the door. Delezene showed it to Cotton and said "look at this." Delezene questioned Manning on whether it was hers, Cotton didn't question her. Delezene threatened Manning with tests and fingerprinting, not Cotton. Cotton didn't even know if those tests were possible or productive. Cotton went to the cruiser and played the video to determine if Manning made movements consistent with retrieving the bag from its hiding place. He found it inconclusive, but felt that it was certainly possible for a handcuffed person to retrieve the small bag from a pocket or other place. He believed since Manning's hands can't be seen it wasn't clear if she did or didn't have the bag of drugs. He will testify in his experience anytime you cannot see Manning's' hands that is a possible time when she could be moving the drugs, as it wouldn't take much in order to dispose of this small amount of methamphetamine.

As noted in the Appeals Court's recitation of the events, Manning speculates that Cotton had an opportunity to toss the bag of drugs into the space near the passenger door when he slid into the back seat from the other side to release Manning's seat belt. That would have placed Manning's body between him and the place where the drugs were found. Did he then have the ability to slide the drugs over behind her as she slid out of the passenger door and before she stood outside and turned around? Complete speculation. And, if he did, why didn't Manning see this motion as she got out within a foot of the car?

The video corroborates that Manning's posture and movements in the cruiser allowed for moving the bag. The video shows throughout the ride Manning leaned forward and toward the

- 15 -

passenger door.  Her posture put her hands directly over the place where the bag was found.  Nothing on the video is sufficient for the jury to conclude that Cotton or Delezene must have put the drugs there.

Manning will fail to carry her burden of presenting evidence from which a reasonable jury could find Cotton planted the drugs.  At the close of evidence, he must be dismissed.

OFFICER DELEZENE'S CONDUCT

Much of what has been said, above, applies to Officer Delezene.  Delezene didn't make the decision to pull Manning over and he initially stayed in the cruiser and radioed information about the traffic stop.  He approached the passenger side of Manning's van while Cotton engaged the driver and stood there, looking at the van, as Cotton made the decision to take her into custody for the outstanding warrants.  Delezene's participation, to the extent there was any at this point, shows no evidence of any motivation to frame this woman with the bad taillight.  He seems totally disinterested.

Delezene's participation in the events that then led to Manning's arrest is also seen in the cruiser video.  When Delezene left the cruiser and walked to the passenger door of the van, he just listened while Cotton got Manning's information and heard she had a warrant for her arrest.  He simply stood by while Manning made her phone call and Cotton politely spoke with her.  After she sat on the cruiser's bumper, Delezene stood watching her and talking to her.  He also has not touched her or acted in any way aggressive toward her.  Delezene even helpfully explained that Manning would be better off going to jail that night and getting credit for the full day.

When Manning protested being taken to jail, Delezene didn't intervene or force himself into the conversation.  Delezene stands quietly, allowing Manning to talk to the woman from the

- 16 -

nearby house and the children and to make a phone call. He even spoke to Manning's friend and explained what was occurring. Just as during Cotton's analysis, we should question if a reasonable jury could see when Delezene decided to frame this woman for a crime. The video certainly doesn't show anything that would allow a reasonable jury to decide that's what is happening. Delezene shows little real interest in the situation; he's just standing by to assist in this traffic stop as it evolves into a required transport.

After Manning is told she must be handcuffed, Delezene and Manning move briefly out of camera view and around on the passenger side to the rear of the cruiser. Looking through the back window, we see Delezene handcuffing Manning, moving her to the rear passenger door, and helping her into the back seat. Delezene is the only officer ever near the rear passenger seat where the drugs are later found.

When Manning gets into the rear seat, via the passenger side, we see Delezene's hands assisting her. We cannot see the lower ledge where the drugs were later found, but we see that Delezene's flashlight briefly illuminates that area just as he will describe. We hear Manning ask Delezene to remove her phone from her back pocket, the left pocket in which she'd previously been seen putting the phone – the pocket away from the door – and he courteously does so. Manning was seen by Delezene as just a mother caught up in an unfortunate situation. Nothing raised any suspicion that she possessed drugs, so he used his discretion and didn't search her.

As noted during Cotton's analysis, the drive to the jail is uneventful for Delezene. There's no verbal indication he has hatched a plan to make this a drug arrest. If Delezene began to plan to plant the drugs and frame Manning, he certainly didn't speak of it or even question Manning about the subject of drugs.

Delezene will also testify when they arrived at the correctional center, he went to the trunk and placed his gun into it, as no weapons are allowed in the facility.  For the reasons Delezene had for not searching Manning, he's not concerned about leaving her outside of his view – he doesn't believe he needs to watch her.

The area where Delezene saw the small bag of drugs on the ledge between the hard seat and the door is accessible to persons inside when the door is shut.  A photo of the area will be provided to the jury.  He'll testify that see saw the bag right as he opened the door and looked down.  Manning doesn't dispute this occurring immediately as she got out and stood next to the car.  So Delezene had no real time to put the drugs there without Manning seeing him do it.

Delezene agrees he told Manning tests and fingerprinting could be done to show it was hers, but that was a bluff.  His information was no better than Cotton's about whether those tests were possible or productive.  He'd leave that to the crime lab professionals.  Most importantly, Manning offers no evidence showing otherwise; no expert testimony, nothing, only speculation about Delezene's motives.   Delezene was the only one to make that bluff, Cotton wasn't involved.  When he found the bag on the door sill, Delezene believed his partner, the driver, had made a pre-shift inspection of the back seat as required of them and that the bag had not been there. He knew when he put Manning in he didn't see it. So he reached the only logical conclusion: Manning put it there.  Her denials were believed to just be the typical denials of a person caught trying to dispose of their drugs

The bottom line is there will be no substantive evidence that Delezene illegally planted drugs on Manning.  There is no evidence that Delezene had anything to do with the drugs before he picked them up.  He will never be shown to possess them, never to have any conversation or

mention about the drugs before they were found, never express any plan to plant them, and can offer a logical explanation for not accepting Manning's demands made after they were found.

<u>EITHER OFFICER'S CONDUCT</u>

The jury will be reminded that neither officer had any idea who Manning was before they turned and went to stop her van.  She was just a woman driving a van with a defective light who was found to have warrants for arrest due to non-violent, non-drug related failures.  As they stood in the driveway talking to her, they were courteous, answered her questions, and tried to make the encounter as comfortable as possible in the circumstances.  They did not treat her as a criminal.  They did not act toward her as someone they would choose to frame for drug possession.  Any citizen would be proud of how these officers conducted themselves and a reasonable jury will too.  There was nothing about the circumstances that would motivate either officer to try to plant drugs and frame this woman for a crime.  She's just a mother picking up her kids who had the misfortune of having a warrant for her arrest.

Manning will make much of the video showing her in the back seat of the cruiser during the drive to jail.  She'll argue the video conclusively shows she didn't dispose of the drugs, but that argument is irrelevant.  That spin on the video might have been sufficiently inconclusive for a jury to acquit her of criminal charges, but it means little about whether the officers planted the drugs.  The undisputed evidence to be presented at trial will show:

➢ The drugs were found immediately next to where Manning sat.

➢ Manning had opportunity to put the drugs there.

➢ Manning had motivation to put the drugs there – she was about to enter the jail where a thorough search would occur.

➢ The cruiser's rear seat had been inspected at the start of the shift and no drugs were seen.

➢ The officers had no reason to think anyone else had been in that rear seat.

➢ The drugs were in a spot highly visible, but were not seen when they put Manning into the cruiser.

➢ The only evidence about either officer shows they reasonably believed Manning was the only possible possessor of those drugs who could have put them where they were found.

This portion of the brief should be ended by paraphrasing the district court's own words when it dismissed the conspiracy claims:   Manning will present no evidence, other than the package of methamphetamine and her "pure speculation" that either of these two officers acted individually to plant methamphetamine in the cruiser.

**EVIDENCE OF MUNICIPAL POLICY, PRACTICE**
**OR CUSTOM WILL BE LACKING.**

In not granting summary judgment, the district court, nonetheless, accurately called the evidence against the City "thin."  After trial, that will be a charitable characterization.  Although the evidence Manning presents against the City is intertwined with the evidence she presents against the officers, it will be insufficient to show the necessary policy, practice, or custom.  Manning claims only that two other officers had previously been accused of planting drugs and, in her non-expert opinion, the investigation had been botched, allegedly on purpose to send a message to other officers that they can get away with this criminal behavior.  She contends Cotton and Delezene then concluded they could plant the drugs on Manning with impunity.

Manning's claims against the City rest upon allegations about one single, unrelated, occurrence that purportedly sent a causative message that unconstitutional framing of suspects will be tolerated.  That message, even if it occurred as Manning contends, will be shown to be expressly contrary to established, written, Omaha Police Department policy.

- 20 -

Case law holds there is "an important distinction between claims based on official policies and claims based on customs. Because an official policy speaks for itself about the intent of public officials, proof of a single act by a policymaker may be sufficient to support liability." *Jenkins v. County of Hennepin*, 557 F.3d 628, 633 (8th Cir. 2009) (citing *McGautha v. Jackson County*, 36 F.3d 53, 56 (8th Cir. 1994)); see also *Crawford v. Van Buren County*, 678 F.3d 666, 669 (8th Cir. 2012) ("Although rare, a public official's single incident of unconstitutional activity can establish the requisite policy if the decision is taken by the highest officials responsible for setting policy in that area of the government's business." (internal quotation marks and citation omitted)). "To establish the existence of a policy, [a plaintiff] must point to 'a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters.'" *Jenkins*, 557 F.3d at 633 (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)). A plaintiff "must also show that the policy was unconstitutional and that it was 'the moving force' behind the harm that he suffered." Id. Those cases show two circumstances may lead to municipal liability: (1) a municipality's action or policy "itself violates federal law, or directs an employee to do so," and (2) where "an official policy is lawful on its face and does not compel unconstitutional action," but "municipal action has led an employee to violate a plaintiff's rights," and that action was "taken with deliberate indifference as to its known or obvious consequences." *Hollingsworth*, 2015 WL 5155354, at *5 (internal quotation marks and citations omitted).

"In contrast to the evidence required to establish an official policy, [the Eighth Circuit has] emphasized that a custom can be shown only by adducing evidence of a 'continuing, widespread, persistent pattern of unconstitutional misconduct.'" *Jenkins*, 557 F.3d at 634 (quoting Mettler, 165 F.3d at 1204). "'[L]iability may be established through proof that the

alleged misconduct was so pervasive among the non-policy making employees of the municipality as to constitute a "custom or usage" with the force of law,'" and, therefore, liability "'cannot arise from a single act.'" *Crawford*, 678 F.3d at 669 (8th Cir. 2012) (quoting *McGautha*, 36 F.3d at 56-57).

To prevail against the City, Manning will rely upon one isolated incident of alleged police misconduct involving totally unrelated facts and participants. There will be no evidence any Police Department policy-maker made any decision about investigating that unrelated incident that meets the criteria stated in the opinions cited above.

It is expected that the police chief and internal investigations commander, who were in those roles at the time of the previous incident, will testify about what occurred and the investigative decisions made then. One of the previously accused officers will testify that the investigation into her conduct was thorough and doggedly conducted with much grief to her. Even if Manning's evidence could be construed to suggest a pattern or custom, it will fail to establish any City policy maker was indifferent to, or tacitly authorized, any misconduct.

Further, the evidence will show Cotton and Delezene knew very little about that prior alleged misconduct and the investigation. Even if policy can be distilled from this one isolated incident, the causal link to Cotton and Delezene will be missing.

But Manning is attempting to make the City's investigative decision more than just a declaration of policy. She will try to say the message sent was that successfully planting evidence gets rewards because you look productive with little risk and you'll be discovered by the Department. She wants to argue this motivated Cotton and Delezene, as it was a way to get an arrest with minimal effort. She wants to argue that the officers were more likely to try this to get that notoriety. Manning offers these officers' awareness of the prior accusations is proof

these officers likely tried to plant evidence themselves; essentially arguing "that's what cops do to get an arrest that looks good to other cops."  So evidence of what occurred or didn't occur during the Department's previous investigation is being offered beyond just as evidence of policy.

The City of Omaha must be dismissed upon the proper motion.

## ANCILLARY PROCEEDINGS AND EVENTS

This trial will present evidence that often is kept out via motions to bifurcate and motions in limine.  The defendants' motion in limine of the evidence, with respect to one portion, was denied and was not renewed.  The potential evidence will be discussed here.

Evidence or testimony is expected about the death of Manning's young daughter, Payton, and the County Attorney's dismissal of the drug charges.  Such testimony is typically irrelevant, immaterial, and likely to elicit sympathy and to confuse the jury about whether lack of conviction indicates a lack of credibility in the officers' testimony about the drugs they found in their cruiser.  This argument was made in a motion in limine that was denied.  The arguments made by Manning in opposing that motion in limine has led to the defendants not renewing that motion in limine.  The defendants expect both the plaintiff and defendants will speak of these events.

After Manning was charged with possession, a preliminary hearing was held and Manning was bound over for trial.  Before trial could occur, however, Manning's 5-year old daughter, Payton Benson, was tragically killed by a bullet fired from outside her home as she sat eating breakfast.  The tragedy received great public interest and notice even beyond Omaha and, locally, it generated great media interest.  The death rocked Omaha and brought forth public

expressions of sympathy, support, and concern from the highest elected officials.  The story was repeated as people were arrested and charged with the death.  The media attention to the death was so widespread and intensive that any mention of the unusual circumstances would surely jog many jurors' memories.  Payton's mother was interviewed regularly and held up as a person entitled to the community's support.  She was seen as a very grieving mother.  At a later point, the Douglas County Attorney dismissed the drug possession charges against Payton's mother rather than go to trial under this media spotlight.  That was an understandable decision based on public policy and external factors, maybe even politics, rather than any question about how the drugs got into the cruiser months earlier.

Manning contends her daughter's death is relevant to a showing of damages.  She contended in opposing the motion in limine that during the death investigation her grief was magnified by investigators' questioning her on whether the shooting was somehow related to her drug possession.  She contends these questions were asked of her during her time of grief only because of her prior arrest and pending criminal charges.

Unfortunately, Manning has recently revived the public's memory of her daughter's death.  Within two weeks prior to the start of trial, Manning participated in a television interview commemorating the anniversary of the death.  Although her lawsuit was not mentioned, her interview serves to remind jurors of who she is and of the tragedy she experienced. A conference with the court is scheduled and Manning's recent participation in reminding potential jurors of her loss has to be recognized.  So all the circumstances surrounding that death, both increased grief and humanitarian relief from prosecution, should now come out during trial.

If evidence is presented about the daughter's death, the County Attorney's decision not to go forward with the prosecution after the very public death must be allowed.  We cannot talk

- 24 -

about grief that came from the death without talking about the change in Manning's future that came from the death.  The court understands that jurors in false arrest cases (which are similar to the allegations here) often question what happened to charges and ask if there was a conviction.  Evidence that prosecution was dismissed is often kept out because such a prosecutorial decision can be based on many things totally unrelated to the merits of the prosecution.  Dismissal could be just a humanitarian act by the County's elected official.  But jurors are unlikely to realize that.  What the officers here fear is that the lack of any testimony about the outcome of Manning's arrest might cause jurors to conclude that the elected official had determined Manning had not left the drugs in the cruiser.  Manning has listed as a potential witness the attorney who defended her against the criminal charges.  Why?  Clearly so he can talk about the dismissal of charges.  Equity requires that the defendants can present testimony from the prosecutors.  Testimony of this discretionary decision by a defense attorney might cause jurors to conclude that the prosecutor had determined the officers were not credible – the prosecutor should be allowed to respond.  This implication, when raised by Manning's testimony about her daughter's death, is inevitable.  So testimony explaining the dismissal of charges must be presented.  No cautionary instructions the court may give the jury after the disclosure of the daughter's death can prevent this implication when sympathy unavoidably weighs heavy on the jurors and dominates their thoughts.  If evidence of the death is allowed, then evidence of the dismissal of charges it caused must be presented together.


**CONCLUSION**

The facts that will be established when these officers' conduct is evaluated separately through an individualized analysis can lead a reasonable jury only to a verdict for the defendants.

These officers simply conducted a routine traffic stop that grew beyond their expectations and there will be no evidence of their participation in, or knowledge of, the bag of methamphetamine showing up in that cruiser.  There will be no evidence they had the opportunity or motivation to frame Manning.

Given the lack of knowledge each, independently, had, what else could either of them conclude except that the bag came from Manning?  It wasn't there before she was put in the cruiser and, now, it was there!  The jury can come to only one conclusion:  Manning has failed to carry her burden of proving her allegations.  However the drugs got there, via Manning or some explanation that has not been discovered, there is no evidence they were planted by either Cotton or Delezene.

If Manning truly wasn't guilty of the offense, her unhappiness with the officer's decision to charge her is understandable.  But her unsupported speculation making these officers into corrupt police deserving of our disdain does not support her claims.  Her speculation is just that. It is not evidence.  The correct application of law leads to one conclusion: Both officers are entitled to judgment as a matter of law at the end of the evidence.

VAUGHN COTTON, THEODORE DELEZENE, and CITY OF OMAHA, Defendants,


By: s/Thomas O. Mumgaard
   THOMAS O. MUMGAARD, No. 16004
   Special Projects Attorney
   WILLIAM ACOSTA-TREJO, No. 23302
   Assistant City Attorney
   1819 Farnam Street, Ste. 804
   Omaha, NE  68183
   Telephone:  402/444-5115
   tom.mumgaard@cityofomaha.org
   william.acosta-trejo@cityofomaha.org
   Attorneys for Defendants

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 22nd day of January, 2018, I electronically filed the foregoing **DEFENDANTS' TRIAL BRIEF** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record registered with the court.

s/Thomas O. Mumgaard